**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Alfredo L. CACERES, Defendant-Appellee.**

**No. 76–1091.**

United States Court of Appeals, Ninth Circuit.

Oct. 15, 1976.

As Amended On Denial of Rehearing and Rehearing En Banc Jan. 20, 1977.

**1184**

John F. Cooney, Atty. (argued), of Sol. General's Office, San. Francisco, Cal., for plaintiff-appellant.

James J. Brosnahan (argued), of Morrison & Foerster, San Francisco, Cal., for defendant-appellee.

Before WRIGHT and SNEED, Circuit Judges, and FITZGERALD,* District Judge.

EUGENE A. WRIGHT, Circuit Judge:

Appellee was charged with three counts of bribery of an Internal Revenue Service (IRS) agent [18 U.S.C. § 201(b)]. Before trial he moved to suppress, *inter alia,* tape recordings of three face-to-face conversations with IRS agent Yee. The district court suppressed the recordings. We affirm in part and reverse in part.

The IRS began to investigate appellee's individual and employment tax returns in March 1974. Yee testified at the suppression hearing that appellee offered a bribe in exchange for settlement of appellee's tax dispute. No further contact occurred between appellee and the IRS until January 1975.

On January 27, 1975, Yee again met with appellee and reported to his superiors that the bribe offer had been renewed. On January 30, in a call initiated by the agent, appellee agreed to meet Yee on the following day. Yee suggested the time. The IRS determined that this face-to-face encounter should be electronically recorded. IRS procedures for obtaining authorization for such surveillance required that in all but "emergency situations" IRS agents obtain approval from named personnel in the Justice Department as well as certain designated officials in their own agency. Internal Revenue Manual (Manual) ¶ 652.22.[1] Although proper IRS approval was obtained for the January 31 surveillance, Justice Department approval was not sought. Count

---

* Honorable James M. Fitzgerald, United States District Judge of the District of Alaska, sitting by designation.

1. Paragraph 652.22 provides, in pertinent part:

   (1) The monitoring of non-telephone conversations with the consent of one party requires the advance authorization of the Attorney General or any designated Assistant Attorney General. Requests for such authority may be signed by the Director, Internal Security Division, or, in his/her absence, the Acting Director. This authority cannot be redelegated. These same officials may authorize temporary emergency monitoring when exigent circumstances preclude requesting the authorization of the Attorney General in advance. If the Director, Internal Security Division, cannot be reached, ·the Assistant Commissioner (Inspection) may

grant emergency approval. This authority cannot be redelegated.

   (2) Written approval of the Attorney General must be requested 48 hours prior to the use of mechanical electronic or other devices to overhear, ·transmit or record a non-telephone private conversation with the permission of one party to the conversation. * * * Any requests being telefaxed into the National Office should be submitted four days prior to the anticipated equipment use.

   (3) [A request] must be signed and submitted by the Regional Inspector or Chief, Investigations Branch, to the Director, Internal Security Division. Such requests will contain [reason for such proposed use; type of equipment to be used; names of persons involved; proposed location of equipment; duration of proposed use (limited to 30 days from proposed beginning

I charges that during the meeting on January 31, 1975, appellee gave the IRS agent $500.

On February 5, 1975, Yee scheduled another meeting with appellee for the following day. Again, the IRS did not seek Justice Department approval for the electronic surveillance conducted. Count II alleges that at the February 6 meeting appellee offered the agent $2,000 if he would resolve appellee's tax difficulties satisfactorily.

On February 7, 1975, the IRS sought approval from the Justice Department for further electronic surveillance of face-to-face encounters with appellee. IRS procedures required that such approval be obtained from the Attorney General or any designated assistant attorney general. Despite this requirement, approval was given by a *deputy* assistant attorney general.

After receiving Justice Department and IRS authorization, the IRS monitored a meeting between the agent and appellee on February 11, 1975 during which appellee offered the agent an additional $500. This activity formed the basis for Count III.

Two issues are presented: (1) Did the district court correctly conclude that approval for each of the three electronic monitorings was obtained in violation of IRS procedure? (2) Even if some or all of the monitorings were in violation of IRS procedure, did the district court correctly conclude it was necessary to suppress the evidence obtained?

## I.

### IRS PROCEDURAL REQUIREMENTS

A. *The February 11, 1975 Monitoring*

For the monitoring of February 11, 1975, the IRS agents obtained proper approval

from their own organization, and also obtained approval from a *deputy* assistant attorney general in the Justice Department. At that time the manual read in pertinent part:

> The monitoring of non-telephone conversations with the consent of one party requires the advance authorization of the Attorney General or any designated Assistant Attorney General. Requests for such authority may be signed by the Director, Internal Security Division, or, in his/her absence, the Acting Director. *This authority cannot be redelegated.* These same officials may authorize temporary emergency monitoring when exigent circumstances preclude requesting the authorization of the Attorney General in advance. . . .

Manual ¶ 652.22(1). (Emphasis added.)

█ The district court read the emphasized portion as requiring advance authorization from either the Attorney General or a designated assistant attorney general, without redelegation. The government contends that the district court's interpretation is erroneous, and we agree.

The emphasized sentence prohibiting redelegation relates only to the immediately preceding sentence outlining the procedure for requesting authorization within the IRS. The sentence following that which is emphasized, explaining that "[t]hese same officials may authorize temporary emergency monitoring" without authorization from the Attorney General, clearly refers to IRS officials, not Justice Department officials. Similarly, the words "[t]his authority" in the emphasized sentence must refer only to IRS officials.

This interpretation is supported by analysis of the statutory framework relating to

date); and manner or method of installation] . . . . .

\* \* \* \* \* \*

(6) When emergency situations occur, the Director or Acting Director, Internal Security Division, or the Assistant Commissioner (Inspection) will be contacted to grant emergency

approval to monitor. This emergency approval authority cannot be redelegated. . . . Emergency authorizations pursuant to this exception will not be given where the requesting official has in excess of 48 hours to obtain written advance approval from the Attorney General.

administrative self-regulation of electronic monitoring, and by a review of the pertinent regulatory history. Under 18 U.S.C. § 2511(2)(c), electronic monitoring with the consent of one party is not illegal. *United States v. Ransom*, 515 F.2d 885, 890 (5th Cir. 1975). There is no need in this case, therefore, to identify the limits of Congressional delegation of the power to specially authorize that which is generally illegal. *See, e. g., United States v. Giordano*, 416 U.S. 505, 523, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Rather, we are asked to interpret regulations which have provided procedures for obtaining administrative authority to perform activities which, under the statute, would not be illegal even absent such authorization.

On October 16, 1972, the Attorney General distributed a "Memorandum to the Heads of Executive Departments and Agencies," prescribing principles of agency self-regulation of consensual monitoring of conversations during criminal investigations. It required all federal departments and agencies to obtain advance authorization from "the Attorney General or any designated Assistant Attorney General" before conducting consensual monitoring. The IRS regulations here at issue were drafted to conform to the October 16, 1972 Memorandum. Manual ¶ 652.1(1).

■ By 1974 the Attorney General had amended these procedures so that advance authorization for consensual monitoring could be obtained from any *deputy* assistant attorney general, as well as designated *assistant* attorneys general and the Attorney General. A.G. Order No. 566–74 (April 25, 1974). The IRS neglected to amend its own regulations to conform to the new Justice Department rules.

It is clear that the Attorney General had the power to promulgate the regulations involved here. *See* 5 U.S.C. § 301. Within this legitimate regulatory framework he was free to delegate such departmental functions as he saw fit. *See* 28 U.S.C. § 510. Since this ability to delegate was exclusive to the Attorney General [28

U.S.C. § 509], the IRS by its own regulation could not affect the Justice Department's delegation scheme.

■ As amended in 1974, the Justice Department advance authorization scheme was designed to accommodate requests for consensual monitoring made by all executive departments and agencies. It defies logic to suggest that the IRS, by failing to conform its own regulation to the 1974 Justice Department amendment, implicitly required of the Justice Department a different authorization procedure for IRS requests than was established for requests from other departments.

The language of the Manual (¶ 652.22(1)) does not say expressly that authorization by a deputy assistant attorney general would be insufficient or invalid. To infer such conclusion from the wording would be unreasonable. We hold, then, that the IRS did not fail to comply with its own regulation when it obtained authorization for the February 11, 1975 monitoring from the deputy.

B. *The January 31, 1975 and February 6, 1975 Monitorings*

The IRS failed to obtain authorization from any source in the Justice Department for the January 31 and February 6 monitorings. It argues that the meetings to be monitored on both occasions were scheduled to take place within 48 hours of the request for authorization and, under such "emergency" conditions, the IRS was not required to obtain Justice Department approval. Manual ¶ 652.22(6).[2]

■ We are not persuaded. It is true that in each instance less than 48 hours remained between initiation of the request for monitoring and the scheduled meeting time. But these "exigencies" were entirely government-created. *Cf. United States v. Curran*, 498 F.2d 30, 34 (9th Cir. 1974). There is no reason to believe that the requests could not have been made earlier. The investigation had been going on for some ten months, and the appellee was

readily available for questioning during that time.

We need not here decide what constitutes an "emergency situation" warranting departure from the IRS's self-imposed requirement of obtaining advance authorization from the Justice Department. We conclude only that the agency must present something more than government-created scheduling problems to justify its failure to follow normal authorization procedures.

## II.

### SUPPRESSION OF EVIDENCE

A. *Sourapas-Leahey-Heffner*

The district court relied on three cases to support its suppression order. *United States v. Sourapas*, 515 F.2d 295 (9th Cir. 1975); *United States v. Leahey*, 434 F.2d 7 (1st Cir. 1970); *United States v. Heffner*, 420 F.2d 809 (4th Cir. 1969). In each the court of appeals ordered suppression of evidence obtained as a result of an IRS investigation of putative criminal defendants conducted without the provision of *Miranda*-type warnings as required by IRS regulations.

The government attempts to escape our holding in *Sourapas* by distinguishing it as a case dealing with principles emanating from the Fifth Amendment, whereas this case concerns Fourth Amendment problems. But the *Sourapas* court framed its issue in broad terms: "[W]hether [the IRS agent] failed to substantially comply with the publicized IRS procedures and if so, whether the evidence suppressed was wrongfully obtained . . . ." 515 F.2d at 298.[3]

By holding in *Sourapas* that evidence obtained by IRS activity which did not substantially comply with its own regulations must be suppressed, we placed no special emphasis upon the specific constitutional principles which underlay the regulatory scheme at issue. We regard *Sourapas* as controlling here.

During "a period of increasing disenchantment with the exclusionary rule," *United States v. Leonard*, 524 F.2d 1076, 1089 (2nd Cir. 1975),[4] the suppression of evidence because of noncompliance with an administrative regulation only, without any showing of statutory or constitutional violation, may be a questionable approach.[5] Nevertheless, *Sourapas* remains the law of this circuit. Absent a contrary ruling by the Supreme Court or by this court en banc, we are bound to follow it.

Our decision today does not mean that in every instance a deviation from general guidelines governing Executive exercises of discretion will result in the automatic exclusion of evidence. As noted in *United States v. Leahey*, 434 F.2d 7, 11 (1st Cir. 1970): "We do not say that agencies always violate due process when they fail to adhere to their procedures." Here, however, the noncompliance by the IRS for the January 31 and February 6 monitorings harmed more than just the "efficiency of the I.R.S. operations." *Id.*

B. *Poisonous Fruit*

Appellee asserts that the IRS agent's application for authorization for the February 11, 1975 monitoring contained information illegally obtained during the monitorings on January 31 and February 6. He argues that all evidence obtained from the February 11 meeting must therefore be suppressed as "fruit of the poisonous tree."

---

**3.** Similarly, the *Leahey* court framed the "crucial question" as being

"whether we must exclude this evidence so that agencies will be compelled to adhere to the standards of behavior that they have formally and purposely adopted in the light of the requirements of the Constitution, even though these standards may go somewhat further than the Constitution requires."

434 F.2d at 10.

**4.** *See, e. g., United States v. Janis*, —— U.S. ——, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Stone v. Powell*, —— U.S. ——, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Leonard, supra*, 524 F.2d at 1089 and Supreme Court cases cited; *United States v. Walden*, 490 F.2d 372 (4th Cir. 1974).

**5.** *But see* the analysis of Chief Judge Coffin in *Leahey, supra*, 434 F.2d at 10–11, in support of application of the exclusionary rule in the event of noncompliance with administrative procedure.

**1188**

■ Yet it is clear that the information in the application for authorization was based upon the agent's independent recollection of the meetings of January 31 and February 6, not upon the recordings themselves. Since the agent's presence at the meeting with appellee was scarcely illegal, the agent's own recollection constituted a valid source independent of the "poisonous" tapes.

It was the conversations themselves, not the illegal monitoring thereof, which led to the application for the February 11 monitoring. Since the illegal monitoring itself did not "tend significantly to direct the investigation toward the specific evidence sought to be suppressed . . . ," *United States v. Cales*, 493 F.2d 1215, 1216 (9th Cir. 1974), suppression of evidence obtained on February 11, 1975 was not warranted.

### III.

### CONCLUSION

The district court's order suppressing evidence obtained from the illegal monitoring of January 31 and February 6, 1975 is affirmed. The order suppressing evidence obtained from the monitoring of February 11, 1975 is reversed. Remanded for proceedings consistent herewith.